case numbers 22-5075 and 22-5245 United States of America versus Katrina Robinson oral argument not to exceed 20 minutes per side Christopher Cotton for the appellant you may proceed thank you may it please the court I'm Christopher Cotton assistant US Attorney for the Western District of Tennessee I represent the United States in this case with the court's permission I'd like to defer five minutes for rebuttal this is a consolidated appeal of the district court's ruling on the defendant's post trial rule 29 motion and motion for a new trial we're appealing the court's ruling on count 19 of the indictment in reviewing a rule 29 motion that the court reviews under a familiar standard but it bears repeating briefly here the courts examines all the all the proven light most favorable to the jury's verdict it doesn't weigh evidence it doesn't deal with issues of credibility any issues of credibility resolved in favor of the jury's verdict and it doesn't substitute its judgment for that of the jury and and that bears repeating because in ruling on count 19 post trial the district court did all of those things and I want to to to take a look briefly exactly how the first thing that the district court did in in granting rule 29 judgment of acquittal on count 19 is it said that the government had provided no evidence of inappropriate conduct by the defendant during 2017 and 2018 other than the APR the annual progress report this this constituted improper weighing of the evidence and and putting the weight where it shouldn't go for a couple reasons number one count 19 was all about the annual progress report and when the district court examined that evidence during trial it's um it looked at that report the way a reviewing court should for rule 29 motion and it said it's it's up to its substance subject to these inferences arguably I wouldn't necessarily rule that way as a trier of fact but that's if I do anything else I'm weighing the evidence was the evidence that the defendant received any financial benefit from these false statements in the APR the district court made that the district court made that finding it said this it said there was no funding directly tied to these these reports the annual progress reports and thus Robinson had little incentive to manipulate the data the problem with that is there was direct proof in the in the record to the contrary Dr. Nantumosa who administered the grant for for HRSA to the defendant's company testified that that the APRs were quote absolutely used to evaluate future funding and the district court in I would submit giving giving more weight to the to the fact that another report was filed prior to the the THI receiving funding for the next fiscal fiscal year where whereas the the APR was filed after that funding had had already been rewarded improperly weighed the evidence in this way because Dr. Nantumosa explained that all that it was used to evaluate future funding because it it was used to determine among other things whether program goals were being met and most importantly for our purposes whether any testimony by this administrator that if he had known that it was 161 grant recipients only that that would have affected whether she would get the funding for the next year the there was testimony that if the misrepresentations had had been discovered that could affect future funding and it is that testimony in the that's that that is I believe that the Bruce Holmes the the the essentially the budget officer for the grant I believe he testified that and we're in the record that is I I cannot I cannot point the court right now to to page number I think that it is that there's a site to it in our first brief can you check during the break yes your honor thank you and that's that's an important piece of testimony in another regard although the notice of award for the next year had already been it had already been sent out to the THI at the time that that this APR was filed that didn't just result in the next year's being being rewarded to them in one lump sum bank records show in fact that it was it was awarded monthly over over the course of that next year and so in in in making the making the finding that that there was no funding tied directly tied to these reports and thus Robinson had little incentive to me manipulate their data we would submit the district court improperly weigh the evidence and resolving competing inferences there were in the opposite direction that district court was was supposed to resolve in addition the the district court's finding that there was no evidence of intent to defraud boil down to just one sentence in the order and that was there is no evidence other than Robinson's final submission of the APRs that she checked the data issue in counts 19 and 20 this is another example in which the district court reviewed the evidence the right way in ruling on the rule 20 my motion during trial and did it the wrong way in the in in the post-trial motion the only person involved in preparing the APRs she was not there were there there were there were staff people that did the the the majority of the data entry and then probably all the data entry in in the first in the first instance she was the person who was responsible for for finally submitting that APR but in addition there's there's one other crucial fact and that is she is the certifying official for for the filing of the APR and and reviewing that in connection with her submission a reasonable juror could infer that certificate that certification implies review whereas the the district court simply summarily said that there was no evidence that she checked the data in counts 19 and 20 so I would finally actually I want to take a look at one more important point in the district court ruling on count 19 there was a finding made that the evidence showed that that the defendant had alternately inflated and deflated the scholarship data in in the APRs and but but yet still provided the number of scholarships and the record actually actually shows in the two counts that's that the jury convicted her on that the APRs actually inflated the scholarship data in in both of those years so in summary about the district court's post post trial handling of count 19 I would I would say that again the correct way to decide a rule 29 motion was the way the district court did it during trial where she looked at the at the possible inferences that could be derived from the evidence on that count and said it arguably is subject to these inferences I'm not necessarily saying there's a fact finder I would go I would reach those conclusions but I think if I do anything else I feel like I'm weighing the evidence by going by going further the way the district court did in its post trial ruling the district court just did just that and weighed the evidence. Let me make sure I understand the basis of this argument is that or the gist of this argument is that although the district court indicated that she was not weighing the evidence your position is she in fact did that. That's that's correct. She said during the course that quote that I just that I just read comes from her ruling on the the the rule 29 motion in trial and I think it I think when when this court said that that that was exactly correct if you go any further you're weighing the evidence in the post trial in the post trial order the court went further and weighed the evidence the district court got it right the first time and and and correctly stated the hearing can you get us the record record sites for those two rulings so we can compare what was said on one occasion with the other. So that's when when the district court said I I think if I do anything else. If you need to look for that you can also look for that. I feel like I that that's that's that's in the record at page ID 1727 and that's that's a transcript whereas the the ruling the ruling the other way obviously is contained in the written the written order on the on the post trial rule 29 motion. Counsel can I circle back to your discussion of intent you know you indicated that Ms. Robinson was not the only one who was involved in preparing the APRs but she certified it and the certification is what you're relying on. Was there any testimony from these other individuals though who were involved in that process to talk about what Robinson's role was with respect to review? There were there there were individuals who did testify who said that I did the data entry and and I and I submitted it to Ms. Robinson. Hmm but was there any discussion though about what their interaction with Robinson was like I hear you saying that she certified it so you know you assume that she reviewed it but is there conversation between them saying hey is this accurate have you checked this is there any testimony like that? I don't recall any specific testimony there was there there there there was testimony from from from a witness that they did put on that's that that extent that Ms. Robinson told them do this accurately. So your primary the primary evidence so that the government relied on was the fact that she certified the APR? That's that yes she's yes your honor she certified and and submitted the APR and what the and what the APR contained because what it what it contained was an inflated number of scholarships based on and and the what what the what the APR did was it identified students by a student ID number. It identified the students as who had received the HRSA funded scholarships by student ID number. The the APR inflated the number of scholarships of grant-funded scholarships reported to HRSA compared to the data that was reported to to the state of Tennessee and in addition these the the student ID numbers that were reported as being students that had received scholarships when those student ID numbers were compared to student files from from PHI's own own records none of those matched up with real students and so the there's there's there's not only that the that the scholarships were in inflated but that you you you couldn't find the the agent who reviewed those records couldn't find any student ID numbers that matched up with that with actual students. I take it you didn't have any testimony from any employees saying that Ms. Robinson directed me to misrepresent the numbers. No there was no testimony of that. It was all that the discrepancy was found by the government's investigator. That's correct the an HHS-OIG investigator looked at three three three sets of data look at the APR looked at the scholarship numbers that report that were reported by THI to the Tennessee Higher Education Commission and looked at PHI student files that the government obtained during the search warrant. Is it the government's position that there has to be a harm to the government in order for there to be a violation of the wire fraud statute? No our position is the opposite your honor that the the wire fraud statute punishes the scheme itself and not the success of the scheme. There has to be a scheme to defraud. What's your best authority for that proposition? That is the the Supreme Court's ruling in Pasquantino found at 544 U.S. at 371 quote the wire fraud statute punishes the scheme and not its success. So it looks like I've got a few seconds left and I would be I would in my argument I appeal here but I would be pleased to answer any questions the court had for me about the defendant's appeal and the issues raised there. I assume you're going to bring that up in your response? I will certainly be responding in but I thought I'd offer if the court had any questions now and I see my time is about expired. I'm going to make one observation which which I'm not going to ask you to respond to is a question because it's really not pertinent to the strict issues before us and it and I don't want you to use a lot of time on but I found it really really hard to get a grip on this case and one of the reasons was the indictment was the strangest indictment I have ever seen. It did not it listed it was more a list per count of allegations about discrepancies. There are a lot of things that look like they could have been personally expenses. This is completely apart from the counts we're talking here. I'm just commenting on the indictment as a whole and there was no real narrative about the scheme and I found it really hard to get started on trying to evaluate where we were on the much more the much narrower issues that are before us because I couldn't I couldn't get the scope of the overall case which I mean you know I think I'm an old trial judge I think oh I'll go read the indictment. Well it left me not knowing any more than I knew to begin with so observation. Your Honor and if if there if there were additional things before the counts before the court I think I would have more to say about that and I realize because we've got this very very narrow issue a lot of other stuff that might help us get the big picture is not before us. I found it hard to get the big picture. Can I ask one more question? Sure. The obverse of my point about whether the government has to prove that they are harmed do you have to prove that the defendant gained anything in order to show a wire fraud? Again we don't that's we I would say that we don't we don't have to to show that that the scheme was what was successful for for for counsel 11 and 12 for example where the evidence show that the defendant could gain something without the government being harmed. Wouldn't you agree with that? Yes. Okay so you're saying they don't have to show a gain to the defendant? No for purposes of showing wire fraud we have to show the scheme we have to show the material misrepresentation we have to show the intent to defraud and we have to show a wire. But materiality doesn't that go to whether or not there's a gain or a loss I mean if it's if no one is harmed isn't that another way of saying it's not a material? Not necessarily because of a misrepresentation could could be aimed at trying to to to secure a gain and and conversely to make the victim sustain a loss and it might not might not be ultimately successful in doing that but the the wire fraud scheme is complete if there's a misrepresentation and the intent to defraud. Is there a jury instruction that's commonly given in mail and wire fraud cases that the intent to defraud is what's required it's not this it's not required showing that anybody actually was defrauded? That's I believe that is correct your honor yes. Okay thank you. Thank you we would ask that the district court's ruling on count 19 be reversed. All right Mr. Joe. I'd like to start with that question I mean do you think that there needs to be a gain or a loss from from either side? Yes your honor before before I answer your question my name is Matthew Geale I represent Katrina Robinson who is here today I'm joined by my co-counsel on the case Larry Lorenzi and we would like to reserve five minutes for sir rebuttal on this if that's allowed. I apologize for jumping the gun. No no no I just I didn't want to I am interested in that question and then what what do you support side for your whatever you're saying? Yes your honor so a scheme to defraud and the way that it's presented in the statute is it's a scheme to defraud or to obtain money or property but the courts unanimously have ruled that it has to be a scheme to defraud to obtain money or property and so I don't think that there's necessarily a requirement that the you know defendant gain money but there does have to have to be a scheme to defraud that will actually be able to obtain money or property and so I think that's the the key issue here on this appeal and the fact is that the government just simply offered no proof that this could possibly have been a scheme to defraud to obtain money or property. Well their theory is that because the numbers were inflated that that increased the likelihood that she would get the grant for the next year. Number one your honor that that's not what they indicted Katrina Robinson of and so if you look at that very very unique indictment I'll say the way that these counts were indicted counts 18, 19, and 20 which dealt with the annual performance reports they weren't a separate stand-alone scheme they were part of a larger scheme that was alleged by the government involving theft of property from THI the Healthcare Institute which was the company that was owned by Katrina Robinson it was a for-profit company of which she was at first the sole member of when it was an LLC and eventually changed it into a corporation where she remained the sole shareholder and the sole director and it remained a for-profit entity throughout and so you know I think a baseline and it's important to remember that the profits of the company were her profits and that she could spend those the way that she wanted and that was the undisputed testimony of the accountant who was called by the government Jonathan Miyaku and so you know at issue here is number one that's not what they actually indicted they didn't indict a separate stand-alone scheme related to these APRs and we know that from the numbers because the amount of money that THI received throughout the life of this grant was upwards of two million dollars well they only alleged theft and a corresponding fraud of five hundred and eighty five thousand dollars approximately in the second superseding indictment in the original indictment it was six hundred thousand dollars and in the original indictment they violated you know clearly established law and that's I think part of the reason why the indictment ended up getting as messy as it did and why it really made little sense I think you know I'll start with because this is kind of where you you jumped in on on me judge Bush with my response to the government's appeal but I think it's clear that the district court correctly determined that even viewing the evidence in the light most favorable to the government that no reasonable juror could have found one a scheme to defraud to obtain money or property or an intent to defraud related to the annual report submitted in August of 2018 now it's important because I think you brought up a good point that you know is this just a general scheme to defraud well number one I think that the government has waived that argument that's not the argument one that they made in their original brief before this court it's also not the argument that they made before the district court in the post trial motions related to the motion for trial and the motions for so is your argument really I mean are you conceding that if if there had been a better phrased indictment that there would be enough evidence under the better phrasing to have convicted under count 19 but your argument really is that they didn't give you fair notice in the indictment of the theory they were going to use for convicting under count 19 not exactly no I wouldn't concede that so I think number one that they they did not indict that way it was not the indictment that they brought against Katrina Robinson and so I think there is a fair notice issue but I also think that this report cannot serve as the basis for an independent wire fraud count it wasn't a funding report the undisputed testimony from Nina Tomosa about this testimony from Bruce Holmes that was cited as of just about to that the testimony that I think Mr. Cotton is referring to is just general testimony that if we knew about misrepresentations in these reports it may have affected funding that was the substance of the testimony Bruce Holmes with the second witness but it's not a definitive statement that they would have not given her the funding agreed it was not and it wasn't related to the actual misrepresentations that were alleged the number 161 which you asked Mr. Cotton about you know the the fact is and I think it's important that we you know I hate to address factual issues but I think that the government has misstated what the testimony in the evidence show throughout their brief they've argued that there was some evidence that Katrina Robinson and THI were allocated funds for 200 scholarships in fiscal year 2017 in 2018 and it's important that the reason I think this is important is because that number 161 kind of factors in well the 200 or 215 so there's a number 215 is the total number of students that were educated by THI that were listed on the report the government argues that Katrina Robinson and THI received additional funding that would have given them 200 scholarships for students the problem is they're citing two requests made by THI and so there was what's called a carryover request from the previous year where Katrina Robinson requested additional funding based on leftover money and one of the things that she requested additional funding for was scholarships well the government didn't actually award her more money for scholarships and we have the notice of awards which Nina Tomosa the grant expert in this case testified was the governing document for the terms and conditions the amount of funding allocated to each category and on these notices of award one of the categories was tuition and fees and that was the scholarship category that was the testimony of Nina Tomosa, Bruce Holmes and Richard Haynes who was an HHS OIG special agent and so each of those notice of awards including the notice of award that occurred after the carryover request and award and just for the record those are in the record at R273-2 and it's a kind of a compilation of notices of awards but the two that are specific to 2017-2018 are found at page ID 6699 and 6707 and both of those notices of awards the one that occurred before the carryover request and the one that occurred after the carryover request allocated $90,521 to tuition and fees. Each scholarship was worth $900 the total tuition for this program was $1,300 and so the $900 scholarship went to pay for some of that and so $90,000 it's a very easy calculation 100 scholarships and so the government has cited to this carryover request but not an actual award which was the governing document so the undisputed testimony despite what the government tries to argue in their brief is that Katrina Robinson and THI was awarded funding for a hundred scholarships in fiscal year 2017-2018. So what you're essentially saying then is that the carryover request was declined? No, so the carryover request was actually granted and if you look at the second notice of award you'll see that there are increases in other categories and you can actually see that and I actually questioned Special Agent Haynes about that because he tried to say well no she got more money for the tuition and fees the scholarships but if you actually look at the notices of award there is a notice of award after the carryover request that has additional funding but that additional funding was not allocated to scholarships and so the importance of this is that ultimately the requirement that Katrina Robinson and THI had was to award a hundred scholarships. We know from the undisputed testimony of Richard Haynes that 161 were awarded and that means that she well exceeded that and actually dipped into the funds, the non-grant funds of THI to award additional scholarships to students that otherwise would not have been able to afford this program and so there's just no possible way that this could serve as some sort of standalone scheme to defraud based on the 161 number because there's just no way that that would increase money in any way shape or form because she was meeting the goals. Also it's important to remember that this annual... Is there evidence that she was getting outside other funding for these  There was additional funding related to other parts of the program but not for the scholarships and so this was just... So you're saying that she would have taken money out of her own pocket to give scholarships to... And so each time that a student came it was $1,300 in profit to the company and so what she would do is she would turn around and she would allow some students... Oh, she would... Essentially they're only collecting $400 in revenue for those... Exactly. And so it was more of a credit for these additional students that wasn't given back through the grant. It's a really unique grant. HRSA, the Health and Human Services, I would not say is the most well-run grant entity. I think it's also important to note about this annual performance report. Number one, when Judge Littman cited and stated in her order that there was no direct tie to funding from these reports, well that was verbatim the testimony of HHS OIG agent, special agent Richard Haynes. He testified that there was no direct tie to funding with these reports and the reason being is because this report fell in a very unique time period in the grant cycle. So that report was submitted in July or August and so it was after the fiscal year for which the money was being reported about and so all of that money had already been dispersed. But it also occurred after HRSA had already determined to award THI additional funding for the next year. So we're in a window where this report literally has nothing to do with funding. Funding has already been received and funding has already been awarded for the next year. So we have a report that just simply is not a funding document. It's not a budget document. What Nina Tomosa testified to was that this report was really a demographic report where you would plug in the numbers of students, their backgrounds, their race, their socioeconomic status and then that information was compiled and submitted to Congress to report on the success of the program from that perspective. But not anything to do with the scholarship numbers on that report. And so for that reason we would contend that the district court made the correct decision that there was just simply no evidence of a scheme to defraud in August of 2018. And to the extent that the government in their briefing and then at the lower court have tried to rely on an overarching scheme to defraud or some sort of tie to the July 2016 email, well we've got two years in between. And specifically Judge Littman, the district court judge, she struck all testimony related to any personal purchases that were made in the latter half of 2016 and 2017 and 2018 and 2019. So there is zero proof in the record currently that Katrina Robinson misused any of the funds that were reported under the grant. And in fact, not only is there no evidence that she misused the funds, but the undisputed evidence shows that she met the goals of the program. So there's just no possible way that the submission of this report can evince a scheme to defraud. And to answer I think questions from both Judge Davis and Judge Bush related to the preparation of these reports, at R253 in the record there was testimony from Aisha Wesley, who was called by the federal government, and Chelsea Cox. Both were witnesses who helped enter the data into these reports. They both testified that Katrina Robinson never asked them to do anything untoward with these reports. They both testified that Katrina Robinson had very little involvement with these reports, that they did the heavy lifting and the data entry. And specifically as it relates to Chelsea Cox and to Count 18... Were these individuals prosecuted also? They were not, Your Honor. Do they have any explanation as to why there were these pretty significant discrepancies in what really occurred and what was reported? Yes, they did, Your Honor. I think specifically Aisha Wesley at 4823 through 27 at R253 testified that there were all kinds of data entry issues with this report. That there were actually emails in the record between Ms. Wesley and Nina Tomosa about the problems. There were additional problems in those same emails that were reported by other entities, not THI, about problems with data entry in this report. And that it was just a very confusing and difficult report. Substantive errors or errors that were somehow involved in the system? I think it was... Were you talking about errors at the entry point or errors with the system? I think it was both that were reported. Errors in trying to actually produce the information, but also errors that they were repeating rows sometimes after you would enter it, or they would delete rows. I don't know if it had to do with the substance of what was being entered, though. So, for instance, when you've got tens of incorrect student ID numbers, I don't understand what the correlation would be between the issues that they were encountering and putting in a six-digit number or however many digits the IDs had. So, for instance, if I may go over time to answer... Thank you. One of the issues was that there was a problem with the duplication of rows. And so one of the allegations here is that there were multiple IDs listed that were a number or two apart. And so I think the explanation is just that there were maybe small mistakes. Rows got duplicated. It was difficult to tell whether this row was there or not. And so they just kept trying to enter more data. And so I think that's what led to the confusion and the problems with this system. And for that reason, we would ask that you affirm the district court's grant of judgment of acquittal on Count 19. And I'll address our issues on appeal when I'm back up on Sir Rebuttal. Thank you, Your Honors. May it please the Court. I first want to return to Judge Bush's question about the location, about the discovery of the misrepresentations. And the testimony that I was thinking about was actually from Nina Tomosa at page ID 3875 when she testified that if the misrepresentations had been discovered, she would either give the opportunity to correct the errors or, quote, say that the award needs to be closed. But she didn't definitively say what she would do. She didn't definitively say what she would do. She did say it could result in what she termed the award being closed. And I want to segue from that into the argument that the APR was not a funding document, that it was just demographic data. And that argument really is just arguing a competing inference and resolving it in the wrong direction. Because Dr. Tomosa testified that the APRs were used to evaluate future funding in this way. It was a document that was used, an annual progress report, to look at and determine whether the grantee was meeting the goals of the grant that they had set for themselves. Now, funding for the notice of award for the next year had already been given to THI at the time the APR was filed. But this was part and parcel of a grant that was a cooperative agreement over four years' time that involved a large amount of communication back and forth between HRSA representative Dr. Tomosa and the grantee THI and Ms. Robinson. And so if APRs are showing that the scholarship goals were not only being met but exceeded, a reasonable juror could infer that that was done for the purpose of continuing to keep that flow of money coming. It's not necessary that that money be misappropriated as long as... There's not anything inherently fraudulent about wanting to obtain money to give more scholarships, is there? There's not. So I don't get how that gets you much of anything. Not just more money to get more scholarships, but to pay Ms. Robinson's salary, to pay salaries to keep the lights on because the... That's not an illegitimate goal either. It is not an illegitimate goal. It becomes a problem if you use fraudulent misrepresentations to try and accomplish a goal. It's not an element of wire fraud that the goal of the scheme be something illegitimate in and of itself. Because in each of the years that THI was funded by the grant... What you were talking about was strict inadequacies or errors. I mean, you'd be prosecuting this case not under mail or wire fraud, but under 2001 false statements to the government, wouldn't you? That's correct. Where this particular APR goes further in that it not only inflates the number of scholarships that state data say were actually awarded, but it does so by alleging that students got these scholarships that don't match up to any student records. A jury could look at this and the scope of it, and a jury can infer intent from the scope of a misrepresentation and reasonably infer that those student ID numbers were in fact fabricated. Counsel, what about counsel's argument that this isn't even the fraud that was actually charged in the indictment? What's your response to that? That it was charged in the indictment. Paragraph 8 of the indictment, I believe it was paragraph 8 of the second superseding indictment, charged that, alleged that the defendant made misrepresentations to HRSA and others concerning THI, its operations in educational programs, including but not limited to misrepresentations in the APRs. Count 19 then charges a specific wire, the 2017-18 APR, as being the wire that contains the material misrepresentation. There's further charging language preceding the wire fraud counts that refer back to the general allegations concerning the misrepresentations in the indictment. I believe that my time is up. Thank you. I'll only respond to one thing that the government just stated, which is that paragraph 8 of the indictment says as a part of the larger scheme. I don't have it in front of me, but I am almost certain that that is how paragraph 8 starts. This was not a standalone scheme in the indictment. Now I'd like to get into, while I think that Judge Littman made the correct decision on count 19, I do think that there were some issues where Judge Littman got it wrong. Specifically, I think that the court should have found that double jeopardy attached after the government ended its case in chief and the court dismissed 15 of the 20 counts at issue in the indictment. The standard of review on this is a slight disagreement, although I think the true issue is whether or not there was clear error on Judge Littman's ruling that there was no evidence of bad faith or intent on the part of the government here. In this case, the government made inappropriate charging decisions that ultimately goaded Ms. Robinson into needing a mistrial. In this case, they included counts that they simply had no evidence to prove, and in fact, not only did they not have the evidence to prove it. It looked like the trial counsel sort of gave up on the mistrial motion. So, Your Honor, the How do you characterize what happened? Yes, Your Honor, so specifically we requested a mistrial with prejudice, asking the court to find that double jeopardy should attach. The district court made a ruling on that and found that double jeopardy would not attach, that there was no evidence of bad faith on the part of the government. The district court then asked if we wanted a mistrial with a do-over, and we said we did not want to do that. After consultation with our client, Why isn't that a waiver then? Well, the question is whether or not there was a double jeopardy violation, and we raised that issue and the judge ruled. It's a unique, I think, posture as typically the, I guess, processes that you take the mistrial, and then you raise it as a bar to another prosecution. But what we asked here was to ask the district court to go ahead and make the ruling on double jeopardy, and the district court ruled. And so I don't believe that there was a waiver on that issue. And specifically, we raised the double jeopardy issue, and the court ruled on it. I read that part of the transcript, and it's a little hard to tell exactly whether anything . . . I mean, clearly a decision was made with Ms. Robinson's consent and consultation with her, and given an opportunity, I think I remember, to speak in court to the judge. And it's a little hard to know how to characterize that, though, because there weren't specific questions. I don't think the questions were sufficiently specific to ask her whether she was waiving the double jeopardy argument. I'm not sure if I'm right about that, but I think that's right. I don't think that there were questions about that, but I don't think that . . . But in any event, she elected to proceed. She did elect to proceed with the understanding that the court had already ruled that double jeopardy was not going to attach. That ruling had been made. And so I think we preserved the issue. You know, it's not the, I think, typical procedure, Judge Bush, but I do think that it was a proper way to raise it. There's no requirement under the Fifth Amendment that you raise double jeopardy grounds after you've taken a mistrial. Here, it made the most sense because the court had just examined this, had just delved deep into the overwhelming amount of evidence that the government had in their possession that showed that their theory of the crime was simply not true. They had document after document after document in their possession. They had control of the witness, Jonathan Nyaku. They called that witness. And yet, he had documents that showed that none of the personal expenditures that they had just spent a week putting proof on about was charged to the grant. And that was the theory that the government was proceeding on. Not only was that the theory in their indictment, but three weeks before trial, the district court required the government to file a pretrial memorandum, R-117, explaining their theory of the prosecution. And they said in that memorandum that they were going to prove that Katrina Robinson misapplied grant funds and used grant funds out of the THI account on improper personal purchases. Well, they had the documents, what were called monthly disbursement journals, that showed that each and every one of the types of charges that they alleged were ultimately not charged to the grant. And Jonathan Nyaku, not only did he testify about that and go through those documents, but he also went through lots of the other issues that the government had. I'd also like to note, in addition to the bad faith of the government... You just said the key to why we're down to so, considering just a very narrow issue on appeal, given the scope of the original indictment. Is that the key to it? Yes, I think it is. I think that ultimately the charging document in this case was a complete mess. And I do think that that's important, because I think it's relevant both to the bad faith issue... The reason I ask the question is not because it's exactly pertinent here, but as I indicated earlier, I have struggled to kind of understand this case as a whole, because I think it's important to understand it as a whole than to look at the narrow-knit issues. And I've had trouble with the understanding the case as a whole part. May I address that, Your Honor? Yes, briefly. And I won't go too long, but I think you're right that it is very difficult to understand. We had a lot of trouble understanding it. At one point, we filed a motion for a bill of particulars. We got a bill of particulars, and it helped, but it didn't really explain the overall theory, which is why Judge Littman required them to file this pretrial memorandum explaining their theory three weeks before trial. And, you know, Judge Gibbons, I understand why you maybe don't think that it's particularly pertinent to the issues, but I do think that it is particularly pertinent to our allegation that there was a material variance in this case. You know, we prepared our defense as best we could with the charging document that we had and with the information that we got from the government in that pretrial motion or memorandum. And so I do think that the charging document is relevant to the fact that they, I believe, materially varied. And Judge Littman at the District Court found that there was a variance here, but ultimately determined that it wasn't prejudicial and not material. And I think that that was error. I think it had massive impact on the way that we prepared the case. The way that we prepared was massively impacted by the way that the government varied in this case. You know, we didn't have an opportunity to really understand that they were going to proceed on a new theory and not the theory to the extent that there is one contained in the second superseding indictment. And for that reason, we would also request that the government, excuse me, that the court grant us a new trial in this matter under Rule 33. Thank you, Your Honors. All right. We thank you both for the argument you've given. We'll consider the case carefully.